IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| ALLIANCE FOR THE WILD ROCKIES, | CV 13–168–M–DLC |
| Plaintiff, | |
| vs. | ORDER |
| DEBORAH AUSTIN, FAYE KRUEGER, UNITED STATES FOREST SERVICE, and UNITED STATES FISH AND WILDLIFE SERVICE, | |
| Defendants. | |

Before the Court are the parties cross-motions for summary judgment. For the reasons explained below, the Court grants Defendants' motion and denies Plaintiff's motion.

## BACKGROUND

Plaintiff challenges Defendants' approval of the Rennic Stark Project ("the Project") under the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4331, *et seq.*, the National Forest Management Act ("NFMA"), 16 U.S.C. § 1604, *et seq.*, the Endangered Species Act ("ESA"), 16 U.S.C. § 1531, *et seq.*, and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701, *et seq.* Plaintiff seeks declaratory and injunctive relief.

-1-

The Project is located on the Ninemile Ranger District of the Lolo National Forest, approximately thirty miles west of Missoula, Montana. The approximately 36,000-acre Project area straddles a divide between the Ninemile Creek and Clark Fork River valleys, and ranges in elevation from approximately 3,200 feet near the Clark Fork River to over 7,000 feet atop Stark Mountain. Much of the forested vegetation within the Project area displays a uniformity consistent with post-large-scale, stand-replacing fire conditions; indeed, much of the Project area burned in the early 1900's. FS 000009.[1] The southern end of the Project area borders Interstate 90.

The Project area contains a number of power and communication infrastructure components, including the Bonneville Power Administration Garrison-Taft 500-KV transmission line, Missoula County's Alberton Beacon communication site southwest of Ellis Mountain, and the Forest Service's communication site northwest of Ellis Mountain. FS 000009. Nearly 20,000 acres within the Project area are considered wildland-urban interface, and both the Missoula and Mineral County Community Wildland Fire Protection Plans identify the Project area as susceptible to wildfire and in need of hazardous fuels reduction activities. FS 000010.

---

1. Citations to the administrative record will reference the six-digit Bates stamp.

The Project proposes a host of management measures in part designed to address these conditions, including: commercial harvesting on 1,976 acres; non-commercial young-stand thinning followed by burning on 1,975 acres; ecosystem maintenance burning on 5,250 acres; decommissioning 28.6 miles of road and storing another 22.4 miles; building approximately one mile of temporary road; performing maintenance and reconstruction activities on 34.5 miles of road; replacing three dysfunctional road culverts; completing one stream channel restoration project; and, reconstructing a public access trailhead. FS 000017. The United States Forest Service's ("Forest Service") intention with the Project is to "restore functioning ecosystems by enhancing natural ecological processes, re-establish fire as a natural process on the landscape, improve terrestrial habitat and connectivity, improve aquatic habitat and connectivity, [and] integrate restoration with socio-economic well-being." FS 000013. Defendants cite the need to manage Project area conditions which "predispose [forest] stands to stand-replacing fire events and insect and disease epidemics" as further justification for the Project. (Doc. 32 at 5.)

The Forest Service published the Environmental Assessment ("EA") for the Project in November 2012. FS 000001. The EA discussed the likely effects of the Project on a number of wildlife species, including the ESA-listed threatened

Canada lynx, the Forest Service-sensitive fisher, the Forest Service-sensitive

North American wolverine,[2] goshawk, and westslope cutthroat trout.  FS 000084-

000095, 000099-000106, 000120-000124, 000131-000140.  The analysis area is

not located in designated critical lynx habitat, though the Project area in part

consists of occupied habitat and contains a portion of the Divide Lynx Analysis

Unit ("Divide LAU").  Official records of Canada lynx occurrences have not been

reported in the analysis area in over a decade.  FS 040464, 000084.  Prior to

issuing the EA, the Forest Service determined that the Project "may affect, but is

not likely to adversely affect" the Canada lynx or any lynx habitat in an Amended

Biological Assessment dated October 1, 2012.  FS 003782, 003807.

On March 22, 2013, the Forest Service signed and issued the Decision

Notice adopting Alternative 2 from the EA, as well as a Finding of No Significant

Impact pursuant to 40 C.F.R. § 1508.13.  FS 000251, 000330.  Plaintiff timely

appealed the Forest Service's decision on May 9, 2013.  FS 044970.  The Forest

Service subsequently denied Plaintiff's appeal on June 24, 2013.  FS 049907-

049908.  Plaintiff filed its complaint in this case on August 13, 2013, and moved

for summary judgment on February 14, 2014.  Defendants filed their cross-motion

---

2.  As of publication of the EA, the United States Fish & Wildlife Service ("Fish & Wildlife Service") had yet to propose listing the wolverine under the ESA.  See Section II *infra*.

for summary judgment on March 14, 2014.  The cross-motions were fully briefed as of May 1, 2014.

SUMMARY JUDGMENT STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).  Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered.  *Id.* at 248.

STANDARDS OF REVIEW

## I.    Judicial Review Under the APA.

Neither the ESA, NEPA, nor the NFMA contain independent provisions governing judicial review of agency action; the Court's review in this case therefore proceeds via the APA.  *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1205-1206 (9th Cir. 2004) (citations omitted) (as to ESA and NEPA); *Neighbors of Cuddy Mt. v. Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002) (as to NFMA). Pursuant to the APA, the Court may "hold unlawful and set aside agency action,

findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

"Review under the arbitrary and capricious standard is narrow, and [the Court should] not substitute [its] judgment for that of the agency" whose decision is under review. *Earth Is. Inst. v. U.S. Forest Serv.*, 697 F.3d 1010, 1013 (9th Cir. 2012) (citations and internal quotation marks omitted). "An agency's decision can be set aside only if the agency relied on factors Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation that runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id*. (citations and internal quotation marks omitted).

## II.    Statutory Requirements Under NEPA, NFMA, and ESA.

### A.    NEPA.

NEPA requires federal agencies to prepare detailed environmental impact statements for actions that may significantly affect the environment. 42 U.S.C. § 4332(2)(C). NEPA does not, however, "mandat[e] that agencies achieve particular substantive environmental results." *Marsh v. Or. Nat. Resources Council*, 490 U.S. 360, 371 (1989). Instead, NEPA simply "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information

concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989). Notably, "if the adverse environmental effects of the proposed action are adequately identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Id*. at 305-351 ("NEPA merely prohibits uninformed - rather than unwise - agency action").

An EIS must provide a "full and fair discussion of significant environmental impacts," and inform "decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1. Under NEPA, the Court must "simply [] ensure that the Forest Service made no 'clear error of judgment' that would render its action 'arbitrary and capricious.'" *Lands Council v. McNair*, 537 F.3d 981, 991 (9th Cir. 2008), *overruled in part on other grounds by Winter v. Natural Resource Defense Council, Inc.*, 555 U.S. 7 (2008).

An EA generally precedes an EIS. An EA is a "concise public document . . . that serves to: (1) [b]riefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of

no significant impact; (2) [a]id an agency's compliance with the Act when no environmental impact statement is necessary, and (3) [f]acilitate preparation of a statement when one is necessary." 40 C.F.R. § 1508.9(a). An EA "[s]hall include brief discussions of the need for the proposal, of [project] alternatives . . . , of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted. *Id* § 1508.9(b).

## 2.    NFMA.

The NFMA mandates that the Forest Service "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System, coordinated with the land and resource management planning processes of State and local governments and other Federal agencies." 16 U.S.C. § 1604(a). Land and resource management plans, commonly referred to as forest plans, must "provide for multiple use and sustained yield of the products and services obtained" from individual forest units, and must "include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." *Id*. at § 1604(e)(1). Forest plans must also "provide for diversity of plant and animal communities based on the suitability and capability of the specific land area in order to meet overall multiple-use objectives." *Id*. at § 1604(g)(3)(B). All projects planned within a forest unit must be consistent with the forest plan as well

as any regulations in effect at the time of the decision. *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005) (citing 16 U.S.C. 1604(I)).

### 3.     ESA.

Finally, Section 7 of the ESA requires an agency to ensure that no discretionary action will "jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of [critical] habitat of such species." 16 U.S.C. § 1536(a)(2); 50 C.F.R. § 402.12(a). In evaluating compliance with the no-jeopardy requirement, an "agency shall use the best scientific and commercial data available." 16 U.S.C. § 1536(a)(2). "Only after the [agency] complies with § 7(a)(2) can any activity that may affect the protected [species] go forward." *Pac. Rivers Council v. Thomas*, 30 F.3d 1050, 1055–57 (9th Cir. 1994).

The Forest Service's first step in complying with Section 7 is to obtain from the Fish & Wildlife Service "a list of any listed or proposed species or designated or proposed critical habitat that *may be present* in the action area." 16 U.S.C. § 1536(c)(1); 50 C.F.R. § 402.12(c)–(d) (emphasis added). If the Fish & Wildlife Service advises that a listed species or critical habitat may be present, the Forest Service must complete a biological assessment to determine if the proposed action

"may affect" or is "likely to adversely affect" the listed species. 16 U.S.C. §

1536(c)(1); 50 C.F.R. §§ 402.12 (f), 402.14(a), (b)(1); *Forest Guardians v.*

*Johanns*, 450 F.3d 455, 457 (9th Cir. 2006). Once the biological assessment is

completed, it must be shared with the Fish & Wildlife Service. 50 C.F.R. §

402.12(j). "If [the Fish & Wildlife Service] advises that no listed species or

critical habitat may be present, the Federal agency need not prepare a biological

assessment and further consultation is not required." 50 C.F.R. § 402.12(d).

A determination by the Forest Service in a biological assessment that an

action "may affect" a listed species or critical habitat gives rise to a consultation

requirement under section 7 of the ESA. *Karuk Tribe of Cal. v. U.S. Forest Serv.*,

681 F.3d 1006, 1027 (9th Cir. 2012). Generally, "the minimum threshold for an

agency action to trigger consultation with the Wildlife Service is low." *W.*

*Watersheds Project v. Kraayenbrink*, 632 F.3d 442, 496 (9th Cir. 2010). "[A]ny

possible effect, whether beneficial, benign, adverse, or of an undetermined

character, triggers the formal consultation requirement." *Id.* (citing 51 Fed. Reg.

19926, 19949 (June 3, 1986); *Cal. ex rel. Lockyer v. U.S. Dept. of Agric.*, 575 F.3d

999, 1018–19 (9th Cir. 2009)).

There are two forms of consultation: formal and informal. *Karuk Tribe of*

*Cal.*, 681 F.3d at 1027. Formal consultation is necessary when the Forest Service

has determined that an action is "likely to adversely affect" a listed species.  *Id.*

However, formal consultation is not required if: 1) the Forest Service finds, either

in its biological assessment or through informal consultation, that while a project

"may affect" a listed species, the species is "not likely to be adversely affected"

and 2) the Wildlife Service concurs in writing.  50 C.F.R. §§ 402.12(j)–(k),

402.14(b)(1), 402.13(a).

Section 9 of the ESA prohibits "take" of any listed species.  16 U.S.C. §

1538(a)(1)(B).  "Take" includes "harassment" of a listed species by means of "an

intentional or negligent act or omission which creates the likelihood of injury to

wildlife by annoying it to such an extent as to significantly disrupt normal

behavior patterns."  16 U.S.C. § 1532(19); 50 C.F.R. § 17.3.  If an agency action is

likely to cause take but not jeopardize the species, the Fish & Wildlife Service

may issue an incidental take statement, which establishes the expected impact to

the species, reasonable and prudent measures necessary to minimize take, and

terms and conditions for implementing those measures.  16 U.S.C. § 1536(b)(4);

50 C.F.R. 401.12(i).  If an agency complies with the terms and conditions of an

incidental take statement, it is exempt from ESA section 9 liability.  50 C.F.R.

402.14(i)(5).

**DISCUSSION**

The parties frame their dispute in terms of the Project's effects, or lack thereof, on the Canada lynx, the North American wolverine, sensitive and old-growth-dependent species (fisher and goshawk), and westslope cutthroat trout. The Court will address the parties' claims in the same manner, and will analyze each species in turn.

I.      **Canada lynx.**

Plaintiff alleges four deficiencies in the Forest Service's analysis of the Project's impacts on the Canada lynx: (1) erroneous calculation of potential lynx habitat in an unsuitable condition prior to Project implementation, (2) use of inappropriate mapping methodologies in identifying lynx habitat likely to be affected by the Project, (3) under-reporting of the Project's likely effect on lynx habitat connectivity, and (4) failure to ensure that Project implementation does not jeopardize the lynx under the ESA.

Plaintiff's lynx-related claims derive in large part from the Forest Service's implementation of the Norther Rockies Lynx Management Direction ("NRLMD") in 2007. The Fish & Wildlife Service listed the Canada lynx as a threatened species under the ESA in 2000, citing a lack of management standards in forest plans as a primary threat to lynx viability. FS 040052. The NRLMD amended a

number of national forest plans to provide the needed standards, including the Lolo National Forest Plan governing the Project area. FS 040660. The NRLMD contains standards related to habitat connectivity, vegetation management projects, livestock grazing management, human use projects, projects proposed within habitat linkage areas, and monitoring. FS 040660-040668.

## A. Existing unsuitable habitat in the Divide LAU.

Plaintiff claims that the Forest Service, by essentially adopting an unsupported definition of snowshoe hare habitat and consequently miscalculating the amount of currently-unsuitable habitat within the Divide LAU, failed to comply with the Forest Plan as amended by the NRLMD. Defendants contend that Plaintiff fails to recognize the flexibility inherent in the NRLMD's habitat definitions and tree stand phase descriptions. The facts favor Defendants on this point.

There are two different vegetation management standards at issue in this case. Both of these standards are found in the NRLMD. The first standard, VEG S1, provides that "[i]f more than 30 percent of the lynx habitat in an LAU is currently in a stand initiation structural stage *that does not yet* provide winter snowshoe hare habitat, no additional habitat may be regenerated by vegetation management projects." FS 040662 (emphasis added). The second standard, VEG

S2, provides that "timber management projects shall not regenerate more than 15 percent of lynx habitat on [forest] lands within an LAU in a ten-year period." *Id*. Taken together, the provisions are designed to govern the rate of management-induced change.

Both standards rely on a number of defined terms. The NRLMD defines "stand initiation structural stage" as follows:

> The stand initiation stage generally develops after a stand-replacing disturbance by fire or regeneration timber harvest. A new single-story layer of shrubs, tree seedlings, and saplings establish and develop, reoccupying the site. Trees that need full sun are likely to dominate these even-aged stands.

FS 040673. Projects which include "vegetation management" components "change[] the composition and structure of vegetation to meet specific objectives, using such means as prescribed fire or timber harvest." FS 040674.

"Regeneration" under the NRLMD generally refers to the creation of "an entire new age class." FS 040673. Finally, "winter snowshoe hare habitat" refers to "places where young trees and shrubs grow densely – thousands of woody stems per acre – and tall enough to protrude above the snow during winter, so snowshoe hare can browse on the bark and small twigs." FS 040674. Such "habitat develops primarily in the stand initiation, understory reinitiation and old forest

multistoried structural stages." *Id*.

Figure 3-2 in the NRLMD's Final Environmental Impact Statement sheds considerable light on the above standards and definitions. Forested swaths in the "stand initiation" or "young regenerating forest" structural stages are "not used [by lynx] in the winter for about the first ten to 30 years after disturbance because the trees and shrubs are not tall enough to protrude above the snow," though they "may provide denning habitat." FS 040210. However, such stands could provide "winter snowshoe hare habitat after about ten to 30 years, if trees are dense enough and tall enough to protrude above the snowline in places that get deep snow." *Id*. Thus, coarse-scale identification of stands in the "stand initiation" or "young regenerating forest" structural stages does not, on its own, paint a complete picture of those stands' suitability as lynx habitat – some level of on-the-ground observation appears necessary in order to make an informed suitability determination.

The EA for the Project identified 1,210 acres of forested land in the stand initiation (summer foraging habitat - 16 to 29 years) stage, and 2,341 acres of land in the stand initiation (winter foraging habitat - 30 to 45 years) stage, for a total of 3,551 acres in some form of stand initiation growth phase. FS 000087. According to Forest Service mapping, the Divide LAU contains a total of 15,086 acres of

potential lynx habitat, which means that approximately 23.5% of potential habitat

in the LAU is in a stand initiation structural stage. *Id*. The EA further indicates

that approximately 6.5% of the Divide LAU, or 992 acres, is temporarily

unsuitable as habitat due to past fire and harvest activities. *Id*. In total, without

qualifying the nature of those units and stands in the stand initiation structural

stage, the LAU appears to be at the 30% threshold contemplated in the NRLMD's

VEG S1 standard.

Again, however, this figure alone presents an incomplete picture. The

Forest Service performed what appear to be extensive on-the-ground surveys of

the units and stands in the Project area proposed for treatment. FS 007928-7942,

008490-008494. In line with the NRLMD, which expressly provides that, where

conditions are right, forests in the stand initiation structural stage can serve as

winter and summer hare foraging habitat, the Forest Service determined that many

of the units and stands in the Project area identified as being in that stage had

developed to the extent they represent suitable habitat. FS 000087, 000089-

000090. Thus, the only unsuitable habitat in the Divide LAU, identified in the EA

as between zero and fifteen years out from a stand replacing event, constitutes

6.5% of the total lynx habitat in the LAU, not 30% as suggested by Plaintiff. The

Project itself will not push the Divide LAU past the thresholds established by the

NRLMD.  Nothing in the record suggests an erroneous calculation or analysis of this figure, and nothing suggests a violation of the VEG S1 or VEG S2 standards. The Forest Service neither made a "clear error of judgment" in violation of NEPA, *Lands Council*, 537 F.3d at 991, nor failed to conform the project to the Lolo National Forest Plan, as amended by the NRLMD, per the NFMA.

### B.  Lynx habitat mapping protocol.

Plaintiff alleges that, because the Forest Service limited its designation and mapping of lynx habitat to areas consisting exclusively of "mature multi-story and stand initiation, presence of wet spruce/fir, exclusive of Grand-fir and cedar/hemlock stands, and at altitudes above 5,500 feet," the EA consequently underestimated the amount of habitat likely to be affected by the Project.  (Doc. 27 at 10-11.)  Defendants argue that, while the factors and habitat types Plaintiff references were part of the overall designation scheme, the ultimate identification of suitable habitat proceeded from a broader set of criteria and, consequently, satisfies the NRLMD.  The record supports Defendants' characterization of the Forest Service's habitat mapping.

The Lolo National Forest completed its most recent lynx habitat mapping update in 2010, and summarized its methodology in the Updated Mid-Level Habitat Classification and Mapping Criteria for Canada Lynx ("Mapping

Criteria"). FS 40899-40912. Mapping proceeded in two steps. First, the Forest

Service "identif[ied] the combination of biophysical and ecological attributes that

comprise potential lynx habitat based on research at known lynx locations." FS

040899. The Forest Service relied in part on the Canada Lynx Conservation

Assessment and Strategy ("LCAS"), cited heavily in the NRLMD, and on Figure

3-2 from the NRLMD itself, as the basis for determining those attributes. The two

documents' descriptions of lynx habitat generally match word-for-word:

> Lynx habitat occurs in mesic coniferous forest that
> experience cold, snowy winters and provide a prey base
> of snowshoe hare. In the northern Rockies, lynx habitat
> generally occurs between 3,500 and 8,000 feet of
> elevation, and primarily consists of lodgepole pine,
> subalpine fir, and Engelmann spruce. It may consist of
> cedar-hemlock in extreme northern Idaho, northeastern
> Washington and northwestern Montana, or of
> Douglas-fir on moist sites at higher elevations in central
> Idaho. It may also consist of cool, moist Douglas-fir,
> grand fir, western larch and aspen when interspersed in
> subalpine forests. Dry forests do not provide lynx
> habitat.

FS 029538, 040671. The Forest Service tailored this definition in the Mapping

Criteria to suit conditions on the west side of the Lolo National Forest, where "the

climate . . . has a warmer maritime influence" and "south aspects between 4500

and 5200 feet tend to be drier . . . , with less snow persistence, and cedar/hemlock

persists." FS 040900. The Forest Service further tailored the definition by

excluding from the mapping algorithm "all dry forest habitat types," grand fir and cedar/hemlock habitat types due to their "occurrence on warm slopes at lower elevations that do not appear to provide the site potential to grow suitable lynx habitat," and Douglas fir unless located on a northerly aspect. FS 040901. This definition – applicable to the west side of the Lolo National Forest, according to the Mapping Criteria – is consistent with the general definition of lynx habitat in the NRLMD and the LCAS, and comports with the Forest Service's own on-the-ground observations of this area of the forest. *See e.g.* FS 007928-7942, 008490-008494, 040901.

The second step of the mapping process focused on forest successional stages. The Forest Service again relied on Figure 3-2 of the NRLMD in determining which stages constitute lynx habitat. For example, the Forest Service mapped stands in the stem exclusion stage, which are generally considered unsuitable lynx habitat, by developing a stem exclusion map layer, then removing stands and forest areas from the layer if certain management or fire activities took place within those areas within a certain time frame. First, the Forest Service "assumed that all [map] polygons with a [tree type] plurality of pure lodgepole pine (PICO) or western larch (LAOC) and a tree size of greater than or equal to 5 inches diameter at breast height (dbh) and tree canopy greater than or equal to

40%" represented stands in the stem exclusion phase. FS 040905. Next, because

unsuitable stem exclusion "stands are generally 45 to 100 years in age," the Forest

Service removed from the map layer any stands/map polygons upon which

"regeneration harvest activit[ies]" had taken place in the last 45 years. *Id*. The

Forest Service also removed any stands/map polygons in which a fire event took

place in the last 35 years, similarly theorizing that such stands would not meet the

age criteria for stands in the stem exclusion stage. *Id*. Similar map layer

development methodologies guided the Forest Service's identification of areas of

the Lolo National Forest in the stand initiation, mature multi-story, and

"intermediate general foraging" stages. FS 040906-040908.

It is clear, consequently, that Plaintiff's characterization of the Forest

Service's mapping process as limited and in violation of the NRLMD's VEG S2,

VEG S5, and VEG S6 standards is erroneous. The Forest Service relied on

detailed mapping protocols based specifically on the definitions and habitat types

contained in the NRLMD and the LCAS. The Forest Service then verified these

findings with on-the-ground field examinations. Where the Forest Service tailored

its geospatial definition of lynx habitat, it did so based on conditions in specific

areas of the Lolo National Forest, as prompted by the LCAS. FS 029538

(describing different lynx habitat compositions for the eastern United States, Great

Lakes states, and western United States). Plaintiff's references to lynx habitat preferences in other parts of the country is inapposite – lodgepole understory density in the North Cascades and upland forest composition in Minnesota simply do not provide any meaningful insight into lynx behavior on dry southerly aspects in western Montana. In short, it is precisely the Forest Service's attention to the Lolo National Forest's microclimate and on-the-ground conditions that renders its mapping methodology anything but arbitrary and capricious. Plaintiff's claim on this point fails.

### C. The Project's likely effects on lynx habitat connectivity.

Plaintiff claims that the Project "does not provide for connectivity of lynx habitat," and "may affect lynx by increasing road density, removing vegetative cover and habitat, displacing lynx, and interrupting linkage." (Doc. 27 at 12-13.) Defendants counter that "[t]he [P]roject maintains and, in most cases, improves upon the habitat connectivity in the [P]roject area." (Doc. 31 at 14.) Again, Defendants have the stronger argument on this point.

The NRLMD accounts for lynx habitat connectivity through the ALL S1 standard. The standard requires that any "[n]ew or expanded permanent development and vegetation management projects must *maintain* habitat connectivity in an LAU and/or linkage area." FS 040660 (emphasis added). To

"maintain" according to the NRLMD "means to provide enough lynx habitat to conserve lynx . . . [i]t does not mean to keep the status quo." FS 040671. The NRLMD further defines "habitat connectivity" as "consist[ing] of an adequate amount of vegetative cover arranged in a way that allows lynx to move around." FS 040670. Connectivity may be provided by "[n]arrow forested mountain ridges or shrub-steppe plateaus," as well as by "wooded riparian areas . . . across open valley floors." *Id*.

The Project is neither located in nor represents a lynx habitat linkage zone. FS 040465. The Divide LAU measures 34,768 acres in size and contains approximately 15,086 acres of potential lynx habitat, approximately 4,150 of which are located within the Project area and approximately 367 of which are proposed for treatment. FS 000087. The portion of the Divide LAU within the Project area represents a peninsula of mapped lynx habitat – no aspect of the Project poses a threat of disconnecting or fragmenting an otherwise continuous swath of lynx habitat. FS 000086.

The Forest Service's conclusions that "[a]ll proposed treatments would maintain a mosaic of forested cover to provide for lynx travel," and that "[t]he substantial reduction in total and open road densities . . . would improve habitat connectivity for lynx," are not arbitrary and capricious given the scope of the

Project EA, the ALL S1 standard, and the specific attributes of the Divide LAU and Project area. FS 000093. The ALL S1 standard does not require the Forest Service to avoid *any* breaks in forest cover or to maintain wide travel corridors for lynx movement. Indeed, the NRLMD simply mandates providing an "adequate" amount of cover to facilitate lynx movement, which given the topography of the Project area will likely consist of "narrow ridges" or "wooded riparian"draws. The Forest Service specifically intends to exclude riparian corridors from any proposed Project Treatment. (*See infra* Section III(A)) Further, contrary to Plaintiff's assertion, there is no indication that decommissioning or storing approximately forty-five miles of forest road, while constructing approximately one mile of new temporary road, will increase road density to the extent it affects lynx movement in this area. In short, Defendants' contention that the Project will improve connectivity appears supported by the record, backed by the best available science, and in compliance with NEPA and the APA.

**D.     Jeopardy under the ESA.**

Finally, as to the Canada lynx, Plaintiff seems to allege that, because of the foregoing failures related to habitat classification and connectivity effects, the Forest Service has "violated its NEPA obligations both substantively and procedurally" and is "depart[ing] from the mandate to protect and recover

imperiled species and their habitats" under the ESA. (Doc. 27 at 15.)

Notwithstanding that NEPA imposes only procedural requirements on government

agencies, *Marsh*, 490 U.S. at 371, nothing in the record indicates that the Forest

Service failed to adequately consider Project impacts or make information

regarding the Project available to the public, in violation of NEPA. The Forest

Service sent hundreds of scoping letters regarding the Project to a wide array of

recipients, among them property owners, commercial entities, political

subdivisions, and interest groups – including Plaintiff. FS 000338-000349. The

scoping letter itself directs recipients to the Lolo National Forest website, which in

turn links to a specific webpage describing the Project and listing individual

analysis documents. FS 000350-000352.

 Further, the Forest Service discharged its lynx-related duties under the ESA

vis-a-vis the Project. The Forest Service analyzed the Project's likely impacts on

the Canada lynx, made a determination that the Project "may affect but is not

likely to adversely affect" the species, published its determination in the EA, and

informed the Fish & Wildlife Service of its conclusion. FS 000084-000095,

003782. The Fish & Wildlife Service agreed with the Forest Service, providing

the following rationale in its concurrence letter:

  The Service bases its concurrence on the information and

analysis in the amended biological assessment prepared by Lorraine Brewer, Forest Wildlife Biologist. The proposed action is located with[in] the Divide Lynx Analysis Unit (LAU). Critical habitat for lynx is not designated in the action area. The proposed action is consistent with all applicable standards and guidelines of the Northern Rockies Lynx Management Direction. Approximately 32 acres of stand initiation snowshoe hare habitat may be underburned as a result of ecosystem maintenance burning. Approximately 3,551 acres of stand initiation snowshoe hare habitat occur within the LAU and the amount affected by the proposed action (32 acres) is about .9 percent. In addition, approximately 8,244 total acres of snowshoe hare habitat, including both stand initiation and multistory, occur within the LAU and the amount affected by the proposed action (32 acres) is about .4 percent. We agree with the conclusion in the biological assessment that project related impacts would not likely adversely affect Canada lynx.

FS 003822-003823. "Under the APA's deferential standard of review, agency action is presumed to be valid if there is a reasonable basis for the decision." *Conservation Congress v. U.S. Forest Service*, 720 F.3d 1048, 1057 (9th Cir. 2013) (citations omitted). The Forest Service had a reasonable, reliable factual basis for its lynx conclusion, and the Fish & Wildlife Service reasonably relied on that basis in its concurrence – nothing in the record indicates that either agency acted arbitrarily, capriciously, or contrary to the law. Plaintiff's ESA claim regarding the lynx is without merit.

## II.     Wolverine.

Plaintiff alleges that the Forest Service violated the ESA in this case by failing to draft a biological assessment for the wolverine, an ESA proposed-listed species. (Doc. 27 at 16.) Plaintiff further alleges a failure on Defendants' part "to provide data or other information regarding wolverine population levels and viability in the Project area," and "a failure to take a 'hard look' at Project impacts on the wolverine" – purported violations of NFMA and NEPA respectively. (*Id*.) Defendants counter that the level of analysis undertaken as to the wolverine, and the findings flowing therefrom, satisfy applicable statutory requirements.

At the time Plaintiff filed its motion for summary judgment in this case, the Fish & Wildlife Service had published a rule "propos[ing] to list the distinct population segment of the North American wolverine occurring in the contiguous United States, as a threatened species under the" ESA. 78 Fed. Reg. 7864-7890 (proposed Feb. 4, 2013). Fish & Wildlife Service regulations indicate that, "[i]f only proposed species . . . may be present in the action area, then the Federal agency must confer with the [Fish & Wildlife] Service if required under § 402.10, but preparation of a biological assessment is not required unless the proposed listing and/or designation becomes final." 50 C.F.R. § 402.12(d)(1). In turn, § 402.10 requires such a conference, "consist[ing] of informal discussions," only

when a proposed agency action "is likely to jeopardize the continued existence of [the] proposed species or result in the destruction or adverse modification of proposed critical habitat." 50 C.F.R. § 402.12(c).

In August of this year, after the parties had fully briefed their respective summary judgment motions, the Fish & Wildlife Service withdrew its proposed rule to list the wolverine under the ESA, having concluded "that the factors affecting the [distinct population segment] as identified in the proposed rule [were] not as significant as believed at the time of the proposed rule's publication." 79 Fed. Reg. 47522 (August 13, 2014). Very generally, the Fish & Wildlife Service determined that the potential effects of climate change on the North American wolverine population are too speculative at this time to warrant listing pursuant to the factors in 16 U.S.C. § 1533(a)(1)(A)-(E). *Id*. at 47543-47545. Consequently, the wolverine is not currently a proposed listed species according to the Fish &Wildlife Service.

Plaintiff's argument as to the adequacy of the Forest Service's wolverine analysis and consultation fails, both under the standards applicable when the species was proposed for listing as threatened and, clearly, under the lack of applicable ESA-based standards given the wolverine's current status. Prior to withdrawal of the proposed rule, the Forest Service would have been required to

"initiate the conference with the [Fish & Wildlife Service]" only if it found that the Project was "likely to jeopardize the continued existence" of the wolverine. 50 C.F.R. § 402.10(a), (b). As the Forest Service described in the EA, the Project is unlikely to have an impact on the wolverine because: "the size of the proposed project is much smaller than an average wolverine home range; the area lacks quality wolverine denning habitat; the potential for disturbing even one individual is low; and the treatments would not convert the area to non-forest, reduce ungulate densities, or increase motorized access." FS 000106. Because the Forest Service determined that the Project would have no measurable impact on the wolverine, let alone jeopardize its continued existence, and because the wolverine was merely *proposed* for listing at the time, the Forest Service's conclusion would have satisfied the letter of the Fish & Wildlife Service regulations. The Fish & Wildlife Service could have "request[ed] a conference if, after a review of available information, it determine[d] that a conference [was] required" due to the Project's effects on the wolverine; the record indicates it chose not to request such a conference. 50 C.F.R. § 402.10(b).

The Fish & Wildlife Service's August 2014 proposed rule withdrawal simplifies the analysis even further – absent a proposal to the list the wolverine, the Forest Service is currently under no obligation to confer or consult with the

Fish & Wildlife Service regarding effects on the species, nor is it required to prepare a biological assessment as Plaintiff claims.

As to Plaintiff's claims that the Forest Service failed to provide wolverine population and viability data in violation of the NFMA and NEPA, Defendants rightly point out that the Lolo National Forest Plan does not contain any provisions that require the Forest Service to do so.  Instead, the Lolo National Forest Plan simply mandates that the Forest Service "manage [forest lands] to maintain population viability" of sensitive species, including the wolverine.  FS 034660.  As described in detail above, the purpose of the Project is, in part, to increase the quality of habitat available for species in the Project area – nothing in the record indicates that Project activities will negatively impact wolverine viability.

## III.  Sensitive and Management Indicator Species (MIS).

Plaintiffs allege that the Forest Service failed to meet its obligations under the NFMA regarding monitoring and management of fisher, a Forest Service sensitive species, and goshawk, a Lolo National Forested designated MIS. Defendants contend that the Forest Service complied with the letter of the Lolo National Forest Plan in reviewing Project impacts on these species.

## A. Fisher population trend monitoring.

Plaintiff alleges that, because the Forest Service has not collected population data regarding the fisher, the agency cannot "support its decision to permit logging in [fisher] habitat" and "has not taken a hard look at Project impacts on the fisher." (Doc. 27 at 21). Defendants counter, as they did regarding the wolverine, that the Lolo National Forest Plan does not require collection of population data for the fisher, and that nevertheless the Forest Service sufficiently analyzed the Project's likely effects on the species. The record again supports the Forest Service's analysis and conclusions.

Like the wolverine, Forest-wide Standard No. 27 of the Lolo National Forest Plan applies to the fisher, as a sensitive species, and requires that the Forest Service "manage to maintain population viability." FS 034660. Forest-wide Goal No. 2 applies more generally, and requires that the Forest Service "provide habitat for viable populations of all indigenous wildlife species." FS 034647. The Plan defines a "viable population" as one "which has adequate numbers and dispersion of reproductive individuals to ensure the continued existence of the species population in the planning area." FS 034982. The "planning area" in this instance, defined as "the area of the National Forest System covered by a Regional or Forest Plan," is plainly all of the Lolo National Forest's approximately 2.1

million acres.  FS 034634, 034965.

Plaintiff essentially contends that Standard No. 27 and Goal No. 2 impose an obligation upon the Forest Service to monitor population levels as the measure of fisher population viability.  (Doc. 27 at 18.)  Plaintiff relies on the 1982 National Forest System Land and Resource Management Planning regulations as the basis for this contention, because § 219.19 of those regulations imposed identically-worded viability requirements alongside the requirement that the Forest Service monitor MIS population trends "in cooperation with State fish and wildlife agencies, to the extent practicable."  47 Fed. Reg. 43026, 43048 (Sept. 30, 1982).  Because the Lolo National Forest Plan expressly imported Standard No. 27 and Goal No. 2 from the 1982 regulations, Plaintiff argues that the monitoring requirement is an implied stowaway.

The Ninth Circuit decided this very same issue in favor of the Forest Service in *Earth Island Institute*, 697 F.3d at 1010.  In that case, the plaintiff alleged that the Lake Tahoe Forest Plan incorporated the 1982 regulations' MIS monitoring requirement by virtue of the Plan's express requirement that the Forest Service "manage habitat to, at least, maintain viable populations of existing native and desired nonnative species."  697 F.3d at 1014 (citation omitted).  However, "because the 1982 rule was superceded in 2000" by updated planning regulations,

the Ninth Circuit court stated that "the requirements of the superceded 1982 rule apply only to the extent they are incorporated into the relevant forest plan." *Id*. at 1013-1014 (citations omitted). The court ultimately held that the Lake Tahoe Plan, through the above requirement, "*did not* incorporate the 1982 rule's viability requirement." *Id*. at 1014 (emphasis added); *see Earth Is. Inst. v. Carlton*, 626 F.3d 462, 470 (9th Cir. 2010) (finding that a forest plan, which stated that the Forest Service "will provide the fish and wildlife habitat and other ecological conditions necessary to maintain well-distributed viable populations of vertebrate species in the planning area, and maintain the diversity of plants and animals," did not contain a viability or monitoring requirement); *compare with Lands Council*, 537 F.3d at 992 (finding that a forest plan, which "requires the Forest Service to manage the habitat of species . . . to prevent further declines in populations which could lead to federal listing under the Endangered Species Act," did contain a monitoring/viability requirement).

There is no substantive difference between the forest plan language in *Earth Island Institute v. U.S. Forest Service, Earth Island Institute v. Carlton*, and the language at issue here, and thus no basis for imposing a fisher population monitoring requirement on the Forest Service for this Project. The Forest Service adopted the Lolo National Forest Plan in 1986, four years after implementing the

1982 regulations.  The Plan incorporates some, but not all, of the language from §

219.19; the Forest Service could have included the section in its entirety, but

chose not too.  Per *Earth Island Institute v. U.S. Forest Service*, only those

portions of the 1982 regulations expressly incorporated into the Lolo National

Forest Plan control, meaning the Forest Service need only "manage to maintain

population viability" in this case.  FS 034660; 47 Fed. Reg. at 43048.

The record indicates that the Project will accomplish exactly that.  First,

utilizing a source that Plaintiff does not take issue with,[3] the Forest Service

identified approximately 5,558 acres of potential fisher habitat within the Project

area.  FS 000102.  Of that, the Forest Service determined that approximately 480

acres of habitat, "distributed in small disjunct patches across 23 treatment units,"

would be affected by commercial treatments.  FS000101.  Approximately 53% of

the identified habitat, or 2,960 total acres, would be affected by non-commercial

treatments, primarily consisting of ecosystem maintenance burning over 2,732

acres.  *Id*.  The Forest Service noted in the EA that these treatments are "designed

to mimic mixed-severity fire regimes and increase structural diversity that may

benefit fisher and fisher prey in the long-term."  *Id*.  Project activities will avoid

---

3.  Fred Samson, *Habitat Estimates For Maintaining Viable Populations of the Northern Goshawk, Black-backed Woodpecker, Flammulated Owl, Pileated Woodpecker, American Marten, and Fisher* USDA Forest Service, Region One (2006).

riparian areas/corridors and old growth, in accordance with current conservation management recommendations.  FS 000100-000101.  At the outset, the Forest Service noted that the Lolo National Forest contains approximately 530,782 of winter fisher habitat and 159,136 acres of summer fisher habitat, well above the 100,078 acre "estimated critical habitat threshold for maintaining a minimum viable population of fisher across all of Region One."  FS 000099.

Ultimately, the Forest Service determined that the Project is unlikely to negatively impact fisher population viability because: (1) "the potential for negatively impacting even one individual fisher is low"; (2) "[t]he project proposes to commercially treat a modest 9% of suitable and potential fisher habitat distributed in small, disjunct patches across multiple treatment units"; (3) ecosystem maintenance burns "are expected to restore ecological processes consistent with mixed-severity fire regimes, providing a mosaic of burned and unburned patches of varying intensity which may resemble the natural disturbances and the succession that follows'"; (4) "[f]orest/riparian ecotones, where optimum fisher habitat occurs, would be adequately protected through no harvest buffers . . . and road decommissioning and storage"; (5) "[c]oarse woody debris and snags would be retained . . . [and] no old growth fisher habitat would be impacted"; (6) "total and open motorized densities would be reduced . . . [,

increasing] habitat security and landscape connectivity"; and (7) the Project

"would not change the age or size class distribution of fisher habitat . . . consistent

with management recommendations for fisher."  FS 000104 (citations and internal

quotation marks omitted).  This conclusion is supported by the record, not

arbitrary and capricious, and sufficient to meet the Forest Service's obligations

under the NFMA and Lolo National Forest Plan.

### B.    Goshawk population trend monitoring.

Plaintiff contends, as it did with the fisher, that the Forest Service violated

the NFMA as to this Project by failing to monitor goshawk population trends.

(Doc. 27 at 21-23).  Defendants counter that the Lolo National Forest Plan does

not require population trend monitoring, but rather requires habitat monitoring

which the Forest Service adequately performed in this case.  (Doc 31 at 24-28.)

The Court agrees with Defendants on this issue.

The Court will not repeat its analysis from Section III(A) as to the level and

type of monitoring generally required of the Forest Service for MIS pursuant to

the Lolo National Forest Plan.  Forest-wide Standard No. 27 does, however, add a

variable to the goshawk equation that was not present with the fisher: the Plan

indicates that, "[a]s monitoring technology becomes available for the goshawk . . .,

population trends will be monitored," and that "[i]n the interim, habitat parameters

including old-growth acres and condition, and snag densities will be monitored as an indicator of population trend." FS 034660. Plaintiff contends that the Forest Service should be able and required to collect goshawk population data, stating that "[i]n the more than quarter-century since [the above] standard was imposed, it would be hard to argue that monitoring technology isn't available for the goshawk, since the basic technology is as simple as counting birds and/or nests." (Doc. 27 at 22). Defendants argue that "technology has not solved monitoring problems," and that this task is not as simple as Plaintiff contends.

This Court will not second-guess Defendant's description of the difficulties inherent in tracking a hawk species with an average home range of 5,000 acres. Defendants state that a simple accounting of goshawk individuals or nests "encompasses difficulties like defining the proper analysis area, finding reliable monitoring methods, retaining qualified and reliable personnel, and dealing with access problems like weather and topography." (Doc. 31 at 25.) Defendants further state that "[e]ven greater problems attend population trend monitoring, including consideration of stochastic events, birth/death rates etc." (*Id*.) Plaintiff fails to cite to any science or methodology to the contrary, and this Court is cognizant "of the deference [it] must apply to the Forest Service's scientific judgments regarding methodology and its interpretation of its own forest plans."

*Friends of the Wild Swan v. Weber*, ___ F.3d ___, 2014 WL 4723559 at *9 (9th

Cir. Sept. 24, 2014).  The Forest Service is not required to monitor the goshawk,

which defies available monitoring techniques..

Nevertheless, the Forest Service *is* required to monitor "habitat parameters

including old-growth acres and condition, and snag densities," and the record

indicates that the agency did so.  FS 034660.  The Project EA describes the Forest

Service's consideration of old growth on the Lolo National Forest and within the

Project area as follows:

> As discussed in the Forested Vegetation section of this
> EA, the Lolo NF Plan EIS established a strategy for
> defining and distributing old growth habitat Forest-wide.
> The Lolo NF was segregated into 71 drainages, and a
> minimum of 8% (all habitat groups combined) was
> allocated as old growth in most drainages where
> wilderness was not available.  Old growth was
> distributed by habitat groups that range from warm dry
> types at lower elevations to moist types at higher
> elevations, recognizing the individual needs of various
> old growth dependent species.  Management Area 21
> (MA 21), representing about 2% of the Forest, was also
> designated in the Plan to evenly distribute old age stands
> for associated wildlife Forest-wide.

> Using the definition of old growth in the Lolo NF Plan
> conservative estimates derived from FIA data collected
> between 1995 and 1996 show at least 14.4% of the
> Forest is old growth or over mature timber.  This
> estimate far exceeds the 8% standard in the Lolo NF
> Plan.  Using the Region One definition of old growth,

> conservative estimates from FIA data show the Lolo NF
> is comprised of 9.6% old growth (90% CI 7.7 to 11.5%),
> slightly above the 8% standard in the Plan and far above
> the 2% allocated in MA21.
>
> .    .    .
>
> Alternative 2 would not commercially treat a single acre
> of old growth habitat as defined by Green et al. or the
> Lolo NF Plan.  In addition, commercial and non-
> commercial treatments would not preclude stands that
> currently do not meet Green et al. from developing into
> old growth in the future.  Nesting and foraging habitat
> for the northern goshawk and pileated woodpecker . . .
> would remain abundant and widespread in the analysis
> area, Forest- and Region.

FS 000120 (citations omitted).  The Forest Service determined that the Project area

can support five goshawk home ranges; each home range in turn requires 180

acres of nesting habitat.  FS 000121.  The Forest Service concluded that, with 364

total acres of goshawk habitat slated for commercial thinning, the Project would

maintain approximately 2,690 acres of goshawk nesting habitat in the Project area,

a figure which exceeds the 900 acres of nesting habitat needed to support five

home ranges.  *Id*.  Further, during Project implementation, "[i]f an occupied nest

area is located in a proposed treatment unit a minimum 40-acre no treatment buffer

would be centered on the nest to completely conserve the nest area," and "[n]o

ground-disturbing activities would occur in a 420-acre post-fledgling area (PFA)

centered on the occupied nest from April 15 (courtship and egg laying) through

August 15 (30 days post-fledging when juvenile feathers become hardened and are

capable of sustained flight . . . .)." FS 000123. Similar analysis attends the Forest

Service's review of snag density in the Lolo National Forest and the Project's

likely effects on snag density. FS 000124-000125. The Court is satisfied that the

Forest Service complied with the Lolo National Forest Plan regarding the Project,

and that the agency's conclusion regarding maintenance of goshawk habitat is not

"arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with

law." 5 U.S.C. § 706(2)(A).

### C.    Proxy-on-proxy MIS analysis.

Dovetailing with the above goshawk argument, Plaintiff's final issue

regarding the Forest Service's consideration of MIS centers on the agency's

alleged inappropriate application of so-called "proxy-on-proxy" analysis. (Doc.

27 at 23-27).

Proxy-on-proxy analysis occurs when the Forest Service uses "habitat as a

proxy for viability" of an MIS, then uses the MIS "as an indicator of the

population of another species," *Friends of the Wild Swan*, 2014 WL 4723559 at

*9. "The use of this proxy approach is appropriate where both the Forest Service's

knowledge of what quality and quantity of habitat is necessary to support the

species and the Forest Service's method for measuring the existing amount of that habitat are reasonably reliable and accurate." *Id*. at *10 (citations and internal quotation marks omitted). Proxy-on-proxy analysis is inappropriate where there is "no data indicating the presence of the species in the area, no suggestion [of] difficulty monitoring the species, and a flaw in the Forest Service's methodology that . . . undermine[s] the use of the habitat proxy approach." *Id*. (citing *Native Ecosystems Council v. Tidwell*, 599 F.3d 926 (9th Cir. 2010)).

Plaintiff likens goshawk presence in the Project area to the circumstances underlying the Ninth Circuit's rejection of proxy-on-proxy analysis in *Tidwell*. In *Tidwell*, the Forest Service project at issue involved livestock grazing on eleven separate allotments over a 48,000-acre swath of mountainous sagebrush grassland in southwest Montana. 599 F.3d at 929. The Beaverhead-Deerlodge National Forest Plan designated the sage grouse as an MIS for sagebrush wildlife habitat on forest lands, including those within the project area, because the "sage grouse is entirely dependent on sagebrush ecosystems." *Id*. at 930. However, the record in the case indicated that the closest active sage grouse breeding area was approximately eleven miles away from the project area, and that there had been no confirmed sage grouse sighting in the project area in the previous fifteen years. *Id*. at 931. Consequently, the Ninth Circuit court held on appeal that the Forest

Service's reliance on sagebrush habitat as a proxy for the sage grouse MIS was misguided given "[t]here [was] simply no basis to evaluate the Forest Service's assertion that the sagebrush habitat [was] sufficient to sustain viable sage grouse populations when sage grouse [could not] be found in the project area." *Id*. at 934.

The situation here is different, and *Tidwell* does not undercut the Forest Service's goshawk analysis on the Project. First, goshawks *have* been observed in the Project area in the past fifteen years. FS 011357-011361. Indeed, though not required to monitor goshawk populations, the Forest Service has surveyed for and found the MIS in and around the Project area:

> Goshawk surveys were conducted in and near proposed commercial and non-commercial thinning treatment units in the summers of 2009, 2010, and 2012 using acoustical calling methods (Woodbridge and Hargis 2006) at calling stations placed every 300 meters (Project File). A silent approach by an adult goshawk occurred on two occasions near Units 8, 9, 10. Intensive nest searches in and near the units did not result in locating a nest.

FS 000120. Considering the 5,000-acre average size of a goshawk home range, the Court finds it noteworthy that the species was twice observed in the approximately 36,000 acre Project area within the three years preceding publication of the EA. These observations are quantitatively and qualitatively distinct from the total absence of the sage grouse in *Tidwell*.

Second, as discussed above, Plaintiff has not made a compelling showing either that the Forest Service has failed to employ the state-of-the-goshawk-detection-art, or that the Forest Service's detection methodology is somehow flawed.  The record is replete with examples of the great lengths to which the Forest Service has gone to detect goshawks, well beyond simply walking around in the woods counting birds and nests, as Plaintiff simplistically suggests.  The Forest Service consistently utilized acoustical calling methods set out at pre-determined intervals to form what amounted to a detection grid.[4]  FS 010224, 11169.  The resulting frequency with which these means actually detect goshawks reflects the species' wide geographic dispersion, not a flaw in the means themselves, and highlights the reason why the Forest Service is permitted to utilize MIS and proxy analysis in the first place.  *See Inland Empire Public Lands Council v. U.S. Forest Serv.*, 88 F.3d 754, 762 (9th Cir. 1996).  Ultimately, the Forest Service's use of proxy analysis in this case was neither arbitrary, capricious, nor in derogation of the Lolo National Forest Plan.

## IV.    Westslope Cutthroat Trout.

Plaintiff alleges that the Forest Service "violat[ed] NFMA, APA, and NEPA

---

3.  Plaintiff does not take issue with the Forest Service's use of what appears to be the best available science concerning goshawk detection: Brian Woodbridge and Christina D. Hargis, *Northern Goshawk Inventory and Monitoring Technical Guide* USDA Forest Service (2006).

by failing to ensure the population viability of [w]estslope cutthroat trout, inadequately addressing how deliveries of sediment to streams and other habitat-degrading activities will affect native populations of this sensitive species, and has not taken a hard look at cumulative effects on Westslope cutthroat trout populations and fisheries habitat." (Doc. 27 at 27).

As an initial matter, Plaintiff's contention that the Forest Service failed to collect data regarding the numbers or distribution of westslope cutthroat trout in the Ninemile Creek drainage is unavailing, considering that the Forest Service relied on well-maintained and extensive fish count data available through the State of Montana's Department of Fish, Wildlife & Parks. FS 005251-005256, 005337. The Forest Service is required to base its decisions on the best scientific data available, and in this case reasonably determined that the State of Montana had collected such a dataset. No identified statutory provision requires the Forest Service to duplicate existing, reliable information sources.

The Lolo National Forest Plan requires the Forest Service to design "[l]and management practices . . . to have a minimum impact on the aquatic ecosystem, free from permanent or long-term unnatural imposed stress." FS 034660. The Plan defines a "long-term stress . . . as a downward trend of indicators such as aquatic insect density or diversity, fish populations, intragravel sediment

accumulations, or channel structure changes that continue for more than [one] hydrologic year as determined by procedures outlined in the Forest Plan Monitoring Requirements." *Id*. The Plan further mandates that "[p]roject level assessments will address the potential impacts of management activities on off-Forest aquatic resources by considering and evaluating downstream data wherever available." *Id*.

The Forest Service is required to monitor the above four indicators in order to meet Forest Monitoring Requirement 2-2, which calls for "validation of aquatic habitat quality and fish population assumptions used to predict [the] effects of management activities and an evaluation of actual effects." FS 034874. Requirement 2-2 mandates annual reporting on this goal, and requires further evaluation of aquatic habitat and/or fish populations if such reporting reveals a decline in either of the two lasting more than one year. *Id*.

Plaintiff does not advance any arguments specifically regarding the Project's effects on insect density and diversity, fish populations, or channel and streambank changes. Plaintiff *does* argue that the Forest Service failed to adequately assess the extent to which the Project will result in increased sediment deliveries to streams within the Project area. The record does not support Plaintiff's contentions on this point.

The Forest Service modeled the impact of what it determined were the Project's three most likely sediment sources: (1) haul-related road use, (2) road decommissioning, and (3) culvert replacement. FS 007838-007839. The Forest Service calculated a short-term uptick in sediment delivery as a result of the Project, but modeling indicated the increase would dissipate within five years. FS 007839. Modeling also indicated that, following the short-term increase, Project-related activities would actually decrease the total amount of sediment delivered to streams within the Project area by approximately 208 tons over a ten-year period following implementation, *as compared to the no-action alternative*. FS 007839. The Forest Service's water resources report for the Project described the modeling methodology as follows:

> Data extrapolation in terms of field inventory, GIS accuracy, and modeling requires interpretations that are suitable for general comparison and understanding trends, but may not be completely accurate for all settings. Models simplify extremely complex physical systems and are developed from a limited database. Although specific quantitative values for sediment and water yields are generated herein, the results are used only as a tool in the interpretation of how real systems may respond. Models used herein include Water Erosion Prediction Project (WEPP) and Equivalent Clearcut Area (ECA) tools and methodologies. Both WEPP and ECA methodologies are widely accepted as reasonable interpretation and prediction tools in the dynamic forest environs. Model results are generated for trend and

magnitude comparisons and should not be considered
absolute values. When evaluating sediment impacts on
water resources, use of the terminology "short-term"
refers to effects expected to last less than 2 years.

.    .    .

Predicted sediment delivery from road crossing
replacements and removals is not addressed by road
surface erosion models like WEPP. The assessment uses
monitoring results from actual culvert removal/
replacement on the Lolo and Bitterroot National Forests.
The data suggests that between 1.1 to 3.2 cubic yards (or
approximately 2.5 to 5 tons) of sediment can be expected
to be recruited to the channel and cause a local sediment
increase downstream as a onetime occurrence. Based on
the Lolo NF monitoring, stream crossing
removal/replacement may generate 1-2 cubic yards of
sediment (1-2.5 tons) per 500 cubic yards of road fill
volume involved. At the Lolo NF crossing removal, 0.4
tons of sediment was produced within 24 hours during
and following implementation. After 24 hours, sediment
levels had declined back to pre-work levels.

FS 007813-007814 (citations omitted). Plaintiff does not take issue with these

methods, and the Forest Service's conclusion that the Project would "have a

minimum impact on the aquatic ecosystem, free from permanent or long-term

unnatural imposed stress" is supported by the results of employing those methods.

As to Plaintiff's cumulative effects argument, the record again supports the

Forest Service's Project analysis. NEPA implementing regulations define

"cumulative impact" as "the impact on the environment which results from the

incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency . . . or person undertakes such other actions." 40 C.F.R. § 1508.7. "Cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* The Forest Service is not required to parse out every individual, historical contributing effect when analyzing cumulative impacts, and courts generally defer to the Forest Service's cumulative impacts analysis. *League of Wilderness Defenders-Blue Mountain Biodiversity Project v. U.S. Forest Service*, 549 F.3d 1211, 1218 (9th Cir. 2008) ("the Forest Service is free to consider cumulative effects in the aggregate or to use any other procedure it deems appropriate . . . [i]t is not for [courts] to tell the Forest Service what specific evidence to include, nor how specifically to present it"). The Forest Service need only discuss past actions or conditions that are relevant to a particular project in its cumulative impacts analysis. *Ecology Center v. Castenada*, 574 F.3d 652, 667 (9th Cir. 2009).

Contrary to Plaintiff's assertion that the Forest Service's cumulative effects analysis is "cursory and unspecific" (Doc. 27 at 30), the EA contains ten pages of fisheries and hydrological cumulative effects discussion. FS 000131-000140. The fisheries direct and indirect effects analysis touches on a number of topics in the

context of the Project, including water quality, habitat access, habitat elements, channel condition and dynamics, flow/hydrology, watershed conditions, and integration of species and habitat conditions. FS 000133-000134. In the fisheries cumulative effects analysis, the Forest Service concluded that: (1) "the most important issues affecting fish populations in Ninemile Creek and the Rennick [sic] Stark analysis area are poor mainstem habitat quality (lack of large complex pools), warm summer water temperatures, and non-native fish species, . . . [n]one of [which] would be addressed or affected under Alternative 2," (2) "[s]light reductions in sediment and improvements in connectivity may contribute to more favorable conditions for native westslope cutthroat and bull trout over the long-term," and (3) "[i]mprovements included in Alternative 2 when combined with past restoration activities would continue to improve watershed trends and conditions in the Ninemile Drainage." FS 000135. Nothing in the record indicates that the Forest Service failed to include relevant information in its past fisheries cumulative impacts analysis. Likewise, when read with the direct and indirect effects analysis preceding it, nothing in the record indicates that the Forest Service failed to identify some significant future Project impact. The Forest Service simply has not violated NEPA's regulatory requirements through this portion of the EA.

## V. Need to prepare an EIS.

Plaintiff argues for the first time in its reply brief that the Forest Service violated NEPA by failing to prepare a full EIS for the Project. Defendants, who did have an opportunity to respond to this argument in their own reply brief, counter that the Court should disregard the argument because it was not raised in Plaintiff's opening summary judgment brief. The Court agrees with Defendants.

"Legal issues raised for the first time in reply briefs are waived." *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1126 (D. Mont. 2013) (citing *Eberle v. City of Anaheim*, 901 F.2d 814, 817-818 (9th Cir. 1990)). The Court need "not ordinarily consider matters . . . that are not specifically and distinctly argued in [an] opening brief." *Dream Games of Ariz., Inc. v. PC Onsite*, 561 F.3d 983, 994-995 (9th Cir. 2009). Given the Court's foregoing review and analysis of each of Plaintiff's claims, there is no need to further consider the argument that the Forest Service neglected to prepare a full EIS – the record demonstrates that such a measure was unnecessary here.

## CONCLUSION

Plaintiff alleges a diverse array of statutory violations on the part of the Forest Service as to the Rennic Stark Project. However, Plaintiff has not proved it is entitled to judgment as a matter of law on any of its claims; on the contrary, the

Forest Service's actions regarding the Project appear thoughtful, informed, and undertaken in the best interests of this portion of the Lolo National Forest. Consequently, Defendants are entitled to summary judgment in this case on all claims.

IT IS ORDERED that Plaintiff's motion for summary judgment (Doc. 23) is DENIED as to all claims.

IT IS FURTHER ORDERED that Defendants' motion for summary judgment (Doc. 30) is GRANTED as to all claims.

IT IS FURTHER ORDERED that Defendants' motion for leave to file a response to Plaintiff's notice of supplemental authority (Doc. 41) is DENIED as moot.

IT IS FURTHER ORDERED that the Clerk of Court shall enter judgment against Plaintiff and in favor of Defendants, and shall close this case.

Dated this 28th day of October, 2014.

Dana L. Christensen, Chief District Judge
United States District Court